FILED
U.S. DISTRICT COURT
AUG 30 PM 1:59
SOUTHERN DISTRICT OF INDIANA
LAURA A. BRIGGS
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DOREL JUVENILE GROUP, INC., Plaintiff,

v.

LOIS DIMARTINIS, Defendant.

Case No. 1:06-cv-1295-DFH-TAB

JURY DEMAND

**COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES**

Plaintiff Dorel Juvenile Group, Inc. ("Dorel") states for its Complaint against Defendant Lois DiMartinis ("DiMartinis") as follows:

**NATURE OF CLAIMS**

1. Dorel brings this lawsuit against DiMartinis, its former Director of Marketing Communications, as a result of DiMartinis' actual, threatened, and inevitable misappropriation of Dorel's valuable confidential information and trade secrets. DiMartinis was one of the most senior and highly compensated executives at Dorel. As a result of that senior position, Dorel entrusted her with much of its most highly sensitive information about its new product designs as well as its confidential marketing, licensing, advertising, and distribution initiatives. All of this information is highly valuable to Dorel's competitors, including Summer Infant, Inc. ("Summer Infant"), DiMartinis' new employer, because Dorel is a market leader in the juvenile products industry and knowledge of Dorel's future product designs and business plans would allow the competition to develop alternative strategies aimed directly at countering those current initiatives. Unbeknownst to Dorel, DiMartinis has misappropriated Dorel's trade secrets and confidential information in order to use them to compete unfairly against Dorel as an employee

of Summer Infant. Shortly before the filing of this complaint, DiMartinis suddenly and unexpectedly announced that she was accepting employment as the Vice President of Marketing for Summer Infant, a position in which she will inevitably use Dorel's confidential information and trade secrets. Prior to announcing her departure from Dorel, DiMartinis falsely represented her future employment intentions in order to obtain ongoing access to Dorel's confidential information and improperly and without authorization transferred sensitive product design and marketing information from Dorel's protected computer network to her own personal email account so she would have ongoing access to it while employed at Summer Infant. Summer Infant's attempt to employ DiMartinis as its Vice President of Marketing is part of an ongoing pattern of conduct by which Summer Infant has hired employees of Dorel in order to gain access improperly to Dorel's sensitive confidential information.

## THE PARTIES

2. Plaintiff Dorel is a corporation organized under the laws of Massachusetts with its principal place of business in Columbus, Indiana. Dorel is engaged in the business of designing, developing, manufacturing, and distributing various categories of juvenile products, including but not limited to, car seats, travel systems, home safety products, gates, bedrails, infant health products, strollers, boosters, potties, bath tubs, monitors, swings, playards and high chairs.

3. Defendant DiMartinis is an individual residing in Walpole, Massachusetts. DiMartinis was employed as Dorel's Director of Marketing Communications until she unexpectedly resigned without advance notice on August 7, 2006 to take a position as Vice President of Marketing at Summer Infant.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Dorel has alleged that Defendant violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

5. As part of her duties for Dorel, DiMartinis traveled to Dorel's Indiana facility and regularly worked with employees located there. As a result, DiMartinis regularly had access, both physically and via Dorel's computer network, to Dorel's confidential information and trade secrets. In addition, DiMartinis is a party to an Employee Confidentiality and Assignment of Invention Agreement ("Confidentiality Agreement") with Dorel which provides: "The parties hereby submit to the jurisdiction of, and waive any venue objections against the U.S. District Court for the Southern District of Indiana. . . ., in any litigation arising out of the Agreement."

6. Venue is proper pursuant to 28 U.S.C. § 1391. The confidential information and trade secrets that DiMartinis has misappropriated are located at Dorel's headquarters in Columbus, Indiana. DiMartinis also improperly accessed confidential information through servers located within the Southern District of Indiana in order to transfer such information without authorization to her personal email account so she could compete unfairly against Dorel.

## GENERAL ALLEGATIONS

### Dorel's Business

7. Dorel designs, develops, manufactures, and distributes juvenile products. The juvenile product business is intensely competitive. Manufacturers of juvenile products, including Dorel, constantly attempt to gain an advantage over their competitors by modifying their existing products to add new features and/or styles that distinguish their products from those manufactured by their competition, and developing new and different products that are unique to the marketplace. Manufacturers of juvenile products, including Dorel, also spend great sums of time and money to develop unique and confidential marketing plans that carefully attempt to target and promote certain products to unique market segments. These plans can include negotiating licensing agreements with other well-known entities and individuals in order to obtain access to well-recognized, high-profile marks and distributing their products through

carefully selected outlets in order to preserve brand identities while maximizing public exposure to their products. Manufacturers of juvenile products also engage in highly sophisticated programs to promote public awareness of their products. Dorel currently distributes products in more than thirty different product categories, more than any other company in the juvenile product business.

8. Dorel has developed valuable confidential information relating to its business. As described more fully below, this confidential information includes, for example, non-public information relating to (a) marketing, sales, and advertising information, including promotions and product launches slated for 2007 and 2008; (b) product development information, such as development strategies and designs, materials, processes of manufacture, and other technical and business information regarding products; (c) licensing arrangements, including the terms of licensing agreements, royalties paid, and product areas covered; (d) company financial information such as profit and loss statements containing detailed information about Dorel's production and development costs, commissions, retail program costs, pricing, and target profit margins; and (e) crisis management information, including internal communications regarding potential redesigns and recalls (the "Confidential Information").

9. Dorel takes measures to keep its Confidential Information secret, including, but not limited to, requiring employees to sign nondisclosure agreements, limiting dissemination of documents containing Confidential Information to key employees on a "need to know basis", use of confidentiality designations on certain documents, use of secure drives which contain product development information, and use of passwords to access the company's computer network. In addition, Dorel takes steps to secure its physical premises with, among other things, visitor

registration, a secure front lobby, electronic card key entry, a designated "restricted area" where product development work takes place, and restricted after-hours access.

10. In addition, Dorel has an Employee Manual that contains a Nondisclosure/Confidential Policy identifying Dorel's confidential and proprietary information and prohibiting employees from improperly using or disclosing Dorel's trade secrets, and an Email and Internet Use Policy that limits employee use of company-provided email and internet services to "business and job-related purposes." The Email and Internet Use Policy specifically states that an unacceptable use of such services includes transmission or receipt of "copyrighted materials, trade secrets, proprietary financial information, or any other information that could be reasonably construed as confidential, without proper authorization." The Employee Manuel is disseminated to employees.

11. Dorel also has a Code of Business Conduct, a copy of which DiMartinis received and signed, identifying Dorel's confidential information and instructing employees not to disclose such information to unauthorized personnel, either inside or outside of Dorel.

12. Dorel's Confidential Information is not generally available. It has been developed and compiled over the many years that Dorel has been in the business of designing, developing, manufacturing, and distributing juvenile products. Much of the value that Dorel derives from its Confidential Information arises from the fact it is not known to Dorel's competitors, and therefore provides Dorel with a competitive advantage. This information would be of unquestionable value to Dorel's competitors, including Summer Infant, where even a slight advantage in the marketplace could mean a substantial amount of profits gained or lost. For example, in this intensely competitive market, knowledge of Dorel's sales and marketing strategies and initiatives, licensing and distribution arrangements, product development plans,

and costs and pricing methods would be of enormous benefit to Summer Infant. Knowledge of Dorel's strategies and plans would allow Summer Infant to anticipate, and more effectively counter, those strategies and would allow Summer Infant to take sales and market share from Dorel, with a corresponding loss of profits to Dorel.

**DiMartinis' Employment by Dorel and her Access to Confidential Information**

13. DiMartinis held several key product development and marketing positions with Dorel and prior to Dorel, Safety 1st, a company acquired by Dorel in 2000. DiMartinis was hired by Safety 1st as a Product Manager in 1997, and was promoted to Senior Product Manager in 1998. She was promoted to Marketing Director in 1999, and, following the acquisition, to Vice President, Product Marketing in 2002. In 2003, she requested a transfer to the position of Director of Marketing Communications, which Dorel granted. DiMartinis held this position until she resigned on August 7, 2006.

14. Pursuant to her duties for Dorel and the high-level positions she held, DiMartinis was given access to Dorel's Confidential Information and assisted in formulating much of it.

15. DiMartinis was directly involved in the formulation and implementation of sales and marketing strategies and licensing arrangements for both new and existing products. DiMartinis has knowledge of Confidential Information regarding Dorel's business, including but not limited to: new distribution initiatives; the precise markets in which Dorel intends to focus its time, energy, and money; the means by which Dorel intends to penetrate those markets; new promotional programs; the terms of key licensing agreements; and internal communications regarding potential redesigns and recalls.

16. DiMartinis also was involved with, and possesses Confidential Information regarding, product development at Dorel. For example, she possesses Confidential Information regarding new products scheduled to go to market in 2007 and 2008 in at least five product

categories in which Dorel and Summer Infant compete. DiMartinis regularly participated in meetings at which concepts for new products were unveiled, and was involved in discussions regarding the advantages and disadvantages of particular product functions and features. Through her participation in such meetings, she gained knowledge of the spectrum of new juvenile products under consideration at Dorel.

17. DiMartinis signed a Confidentiality Agreement with Dorel on November 15, 2001. (A copy of the Confidentiality Agreement is attached to this Complaint and made a part hereof as Exhibit A). Among other things, DiMartinis agreed that Dorel's Confidential Information as defined in the agreement included "technical and business information relating to DLG [Dorel] or its affiliated companies' inventions or products, research and development, production processes, manufacturing and engineering processes, machines and equipment, finances, customers, marketing, and production and future business plans and any other information which is identified as confidential by DLG or its affiliated companies." In addition to agreeing not use or disclose Dorel's Confidential Information, DiMartinis agreed that, upon termination of her employment, she would "deliver to DJG all written and tangible material in [her] possession incorporating confidential information or otherwise relating to the business of DJG or its affiliated companies."

18. DiMartinis further agreed that Dorel would be irreparably harmed by any breach of the Agreement for which there would be no adequate remedy at law, and that Dorel would be "entitled to injunctive relief and/or a decree for specific performance . . . ." DiMartinis also agreed that the Confidentiality Agreement was subject to Indiana law.

19. DiMartinis also signed Dorel's Code of Business Conduct, acknowledging Dorel's Confidential Information (including, among other things, information regarding finances,

costs, pricing, marketing and service strategies) and agreeing to maintain the confidentiality of such information.

**DiMartinis' Resignation and Misappropriation of Confidential Information**

20. DiMartinis went on maternity leave in February, 2006. Throughout her maternity leave, however, she continued to access Confidential Information. DiMartinis repeatedly represented to Dorel that she planned to return to work full time after her maternity leave, including in statements made to her supervisor just hours before she announced her resignation. As a result, Dorel continued to provide her with Confidential Information. Throughout her maternity leave, DiMartinis regularly accessed her e-mail and other electronic data containing Confidential Information through a Dorel-issued laptop computer. She had full knowledge of, and access to, virtually all of Dorel's new product development and marketing plans for 2007 and 2008 including new designs and plans for how Dorel hoped to penetrate particular markets through particular licensing, distribution and promotional programs. DiMartinis continued to participate in telephone conferences and meetings with other members of management, including Vinnie D'Alleva ("D'Alleva"), Dorel's Executive Vice President and General Manager, where Confidential Information was discussed.

21. Unbeknownst to Dorel, DiMartinis' representations about her plans to return to full time work at Dorel were false and misleading. While intending to create the impression that she was a loyal and committed Dorel employee, DiMartinis was actually making plans to work for Summer Infant in a similar marketing position where knowledge of Dorel's Confidential Information would provide Summer Infant with a massive competitive advantage.

22. On August 7, 2006, DiMartinis arrived at Dorel's offices in Canton, Massachusetts. She again claimed to be excited about returning to work full time soon and stated that she needed to pick up some material from her office. Believing those representations,

Dorel allowed DiMartinis access to her office and Confidential Information. In fact, those representations were false and calculated to mislead Dorel. Later that same day, after she had already removed material from her Dorel office, DiMartinis telephoned Dorel and announced abruptly and unexpectedly that she was leaving Dorel to work as the Vice President of Marketing for Summer Infant, starting on September 5, 2006.

23. Before announcing her plans to work for Summer Infant, DiMartinis obtained highly sensitive documents, including Confidential Information, through her access to Dorel's secure computer network and transferred them without authority to her personal email account. These documents included some of Dorel's most important plans and proposed initiatives for 2007 and 2008, and DiMartinis had no legitimate business reason to access them other than via her Dorel-issued laptop. By transferring this Confidential Information to her personal email and/or home computer, DiMartinis was able to ensure that she would continue to have access to this information after she announced her plans to leave Dorel and would be in a position to share it with others at Summer Infant.

24. At a meeting on August 14, 2006 with representatives of Dorel, including D'Alleva and Jennifer Rohrs ("Rohrs"), DiMartinis attempted to conceal her theft of Dorel's Confidential Information. As part of Dorel's standard exit interview, D'Alleva and Rohrs asked DiMartinis if she had returned all of Dorel's property. DiMartinis falsely claimed that she had, concealing from Dorel that she had transferred sensitive Confidential Information to her home email account. Only after DiMartinis had provided this false assurance did Dorel investigate further and through computer forensics discovered the falsity of her claim.

25. DiMartinis is stepping into a nearly identical role for Summer Infant to that she held with Dorel. DiMartinis has accepted an executive-level marketing position with Summer

Infant—a direct competitor of Dorel in the juvenile product industry—where she will be responsible for providing the same kind of input on product development, sales, advertising, and marketing strategies as she did at Dorel. It is not possible for DiMartinis to perform her duties for Summer Infant without disclosing or using Dorel's Confidential Information. DiMartinis' knowledge of Dorel's current strategy for distributing and promoting its products within certain markets and other information makes it inevitable that she will consider that information in performing her responsibilities for Summer Infant. It would be impossible for her to advise Summer Infant about its own marketing strategies without taking into consideration Confidential Information from Dorel. For example, DiMartinis inevitably will rely on her knowledge of new markets that Dorel intends to focus upon and the means for doing so when she considers how Summer Infant can best distribute and promote its own products. Similarly, DiMartinis will inevitably rely on her knowledge of Dorel's pricing, costs, and profit margins, as well as the terms of Dorel's licensing agreements in determining advertising, pricing, and marketing strategies at Summer Infant. It is virtually impossible for DiMartinis to work on new product launches and promotions at Summer Infant without using the information she possesses regarding Dorel's new product initiatives.

26. Summer Infant currently has a smaller share of the juvenile product market than Dorel, and it has struggled to compete aggressively with Dorel to gain market share through any means necessary. Summer Infant's attempt to hire DiMartinis is part of an ongoing pattern of activity designed to enable Summer Infant to gain access to Dorel's Confidential Information. It has repeatedly hired existing Dorel employees and then copied confidential product designs and other marketing initiatives in order to compete unfairly with Dorel, including but not limited to, designs for bath tubs, infant health products and home safety products.

**Irreparable Injury and Need for Injunctive Relief**

27. DiMartinis' new position as Vice President of Marketing at Summer Infant is such that she will be responsible for developing, marketing, and distributing product lines that compete with the product lines for which she was responsible at Dorel, and as to which she had access to Confidential Information while at Dorel. DiMartinis' new position will require her to counter the very development, sales, marketing, and placement strategies that she herself helped to formulate and implement while at Dorel. DiMartinis knows the complete set of development and marketing plans, strategies, and schedules that Dorel has created to compete with Summer Infant. DiMartinis' new employment will require her to plan and execute counter-strategies, plans, and schedules to compete with the very strategies and plans that she helped to create while at Dorel. It is inevitable that DiMartinis will make reference to her knowledge of Dorel's Confidential Information in fulfilling her new job duties for Summer Infant.

28. The harm to Dorel from such conduct will be irreparable. Once confidential information is improperly used or disclosed, its value may be damaged or lost forever and the status quo cannot be restored. It will be extremely difficult, if not impossible, to reasonably calculate all of the profits that Dorel would lose as a result of that conduct. Absent the intervention of this Court, Dorel will be irreparably injured in that its valuable Confidential Information will be in the hands of a competitor and will be used against it in the marketplace, which injury has no adequate remedy at law.

29. Unless the requested injunction issues, Dorel will suffer the lasting and irreparable effects of the unfair competition resulting from DiMartinis' misappropriation of and inevitable use of Dorel's Confidential Information. Moreover, absent an injunction, DiMartinis and Summer Infant will obtain a windfall in the form of dollars and resources saved through

improperly taking and using what Dorel has spent many years and significant sums of money to develop.

30. The balance of harms strongly favors Dorel because, once its Confidential Information is disclosed or used, and once DiMartinis exploits the unfair competitive advantage she and her new employer will reap through misappropriation of Dorel's Confidential Information, the substantial competitive injury to Dorel cannot be undone, whereas DiMartinis has a number of options that preserve her ability to make a living, including working in the toy industry, where she has past experience, with products that do not compete with Dorel's.

31. The public interest favors issuance of the requested injunctive relief. The public is advantaged by the prevention of unfair competition and the protection of confidential information. The consuming public also will be advantaged by a strong, yet lawful, competition in the juvenile product marketplace and should not be deprived of such competition by the unlawful and unfair advantage that DiMartinis would gain through violating her obligations to Dorel and through improperly exploiting and using Dorel's Confidential Information against it.

## COUNT I-TRADE SECRET MISAPPROPRIATION

32. Dorel incorporates and restates Paragraphs 1 through 31 above as if fully set forth herein.

33. Dorel's Confidential Information constitutes "Trade Secrets" as defined in the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1, *et seq.* ("IUTSA") in that:

(a) the Confidential Information is information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) the Confidential Information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

34. DiMartinis obtained access to Dorel's Confidential Information by falsely representing that she expected to return to full time employment with Dorel and by concealing her true intent to work in a comparable position at Summer Infant. DiMartinis' transfer of information from Dorel's computer network to her own personal email and computer prior to the announcement of her resignation on August 7, 2006 was accomplished without Dorel's knowledge or authorization.

35. DiMartinis has improperly and without authorization used and/or disclosed Dorel's Confidential Information, and absent the equitable intervention of this Court will continue to do so.

36. Because DiMartinis is stepping into a nearly identical role for Summer Infant to that she held with Dorel, in which she will be directly responsible for developing and implementing marketing strategies that compete directly with Dorel, it is not possible for DiMartinis to perform her duties for Summer Infant without disclosing or using Dorel's Confidential Information. Unauthorized disclosure or use of Dorel's Confidential Information is therefore both actual and inevitable.

**<u>COUNT II—UNFAIR COMPETITION</u>**

37. Dorel incorporates and restates Paragraphs 1 through 36 above as if fully set forth herein.

38. DiMartinis has engaged in unfair competition with Dorel, including but not limited to: (1) improper access to Confidential Information, (2) improper use of Confidential Information, and (3) the other acts set forth above.

**COUNT III --VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030**

39. Dorel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

40. DiMartinis, knowingly and with intent to defraud, accessed Dorel's secure computer network without authority or in excess of her authority, and obtained valuable Confidential Information from Dorel which she then transferred to her own personal email account and computer.

41. The damage caused Dorel by DiMartinis' improper access to, and misappropriation of, computer data exceeds $5,000.

**COUNT IV-BREACH OF CONTRACT**

42. Dorel incorporates and restates Paragraphs 1 through 41 above as if fully set forth herein.

43. The Confidentiality Agreement executed by DiMartinis on November 15, 2001, and attached hereto as Exhibit A is a valid and binding agreement.

44. DiMartinis breached the Confidentiality Agreement by obtaining access to Dorel's Confidential Information through false and misleading statements in order to use that information in competition with Dorel and by copying electronic information from Dorel's computer network to her personal email and computer without authorization and contrary to the terms of the agreement. DiMartinis' inevitable use and disclosure of Dorel's Confidential Information in the performance of her duties at Summer Infant also constitutes a breach of the Confidentiality Agreement.

45. DiMartinis' misappropriation of Dorel's Confidential Information in breach of the Confidentiality Agreement has caused damage to and will continue to damage Dorel's business, and absent intervention by the Court will cause Dorel irreparable injury.

**COUNT V-BREACH OF FIDUCIARY DUTY**

46. Dorel incorporates and restates Paragraphs 1 through 45 above as if fully set forth herein.

47. As Dorel's Director of Marketing, DiMartinis owed Dorel a fiduciary duty.

48. DiMartinis' conduct described above violated the fiduciary duties she owed to Dorel, to the great injury and detriment of Dorel.

**PRAYER FOR RELIEF**

WHEREFORE, Dorel prays that this Court grant it the following relief:

A. A Preliminary and Permanent Injunction,

(1) Prohibiting DiMartinis from providing services to Summer Infant in any capacity relating to the development, sale, or marketing of any juvenile product category in which Dorel competes for a period of time determined by the Court to be sufficient to eliminate DiMartinis' and Summer Infant's competitive advantage; and

(2) Prohibiting DiMartinis from using or disclosing or threatening to use or disclose any of Dorel's Confidential Information; and

(3) Ordering DiMartinis to return any Confidential Information within her possession, custody, or control to Dorel within ten (10) days of entry of this Court's order; and

(4) Ordering DiMartinis to disclose to Dorel all individuals or entities to whom she provided or otherwise disclosed any of Dorel's Confidential Information at any time.

B. Compensatory and punitive damages, in an amount to be proven at trial.

C. Dorel's attorneys' fees, expenses, and costs.

D. Such other relief as the Court deems just.

## JURY DEMAND

Dorel hereby demands trial by jury of all matters so triable.

Dated: August 30, 2006.

DOREL JUVENILE GROUP

By: [signature]
Jay G. Taylor
ICE MILLER LLP

Charles H.R. Peters
Brenna M. Woodley
Nora Kersten Walsh
Lee Ann Rabe
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois 60606
(312) 258-5500 (telephone)
(312) 258-5600 (facsimile)

Jay G. Taylor
ICE MILLER LLP
One American Square, Suite 3100
Indianapolis, Indiana 46282-0200
E-mail: jay.taylor@icemiller.com
(317) 236-2150 (telephone)

CH1\4671388.1

# EMPLOYEE CONFIDENTIALITY AND ASSIGNMENT OF INVENTION AGREEMENT

This Agreement is intended to set forth in writing my responsibility to Dorel Juvenile Group, Inc. ("DJG") and Cosco Management, Inc. ("CMI"). I recognize that DJG is engaged in a continuous program of research, development, and production respecting its business, present and future. As part of my employment with DJG, I have certain obligations relating to inventions which I develop during that employment.

In return for my employment by DJG, I acknowledge and agree that:

1. ***Effective Date.*** This Agreement ("Agreement") shall be effective on the date signed by the employee.

2. ***Confidentiality.*** I will maintain in confidence and will not disclose or use, either during or after the term of my employment any proprietary or confidential information or know-how belonging to DJG or its affiliated companies ("Confidential Information"), whether or not in written form, except to the extent required to perform duties on behalf of DJG or to the extent required by legal process. Confidential Information refers to any information, not generally known in the relevant trade or industry, which was obtained from DJG or its affiliated companies, or which was learned, discovered, developed, conceived, originated or prepared by me in the scope of my employment. Such Confidential Information includes, but is not limited to, technical and business information relating to DJG or its affiliated companies' inventions or products, research and development, production processes, manufacturing and engineering processes, machines and equipment, finances, customers, marketing, and production and future business plans and any other information which is identified as confidential by DJG or its affiliated companies. Upon termination of my employment or at the request of my supervisor before termination, I will deliver to DJG all written and tangible material in my possession incorporating the Confidential Information or otherwise relating to the business of DJG or its affiliated companies. These obligations with respect to Confidential Information extend to information belonging to customers and suppliers of DJG and its affiliated companies who may have disclosed such information to me as the result of my status as an employee of DJG.

3. ***Inventions.***

   3.1. ***Definition of Inventions.*** As used in this Agreement, the term "Inventions" means any new or useful art, discovery, contribution, finding or improvement, whether or not patentable, and all related know-how. Inventions include, but are not limited to, all designs, discoveries, formulae, processes, manufacturing techniques, inventions, improvements, and ideas.

   3.2. ***Disclosure and Assignment of Inventions.***

      3.2.a. I will promptly disclose and describe to DJG all Inventions which I may solely or jointly conceive, develop, or reduce to practice during the period of my employment with DJG (i) which relate at the time of conception, development, or reduction to practice of the Invention to DJG's business or actual or

demonstrably anticipated research or development, (ii) which were developed, in whole or in part, on DJG's time or with the use of any equipment, supplies, facilities or trade secret information of DJG or its affiliated companies, or (iii) which resulted from any work I performed for DJG ("DJG Inventions"). I assign to DJG & CMI all my right, title and interest worldwide in DJG Inventions and in all intellectual property rights based upon DJG Inventions.

4. ***Competitive Employment.*** During the term of my employment with DJG, I will not engage in any employment, consulting, or other activity in any business competitive with DJG or its affiliated companies without DJG's written consent.

5. ***Acts to Secure Proprietary Rights.***

   5.1. ***Further Acts.*** I agree to perform, during and after my employment, all acts deemed necessary or desirable by DJG and CMI to permit and assist them, at their expense, in perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in DJG Inventions with the understanding that these efforts will not violate any other contract or law. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in the registration and enforcement of applicable patents and copyrights or other legal proceedings.

   5.2. ***Appointment of Attorney-in-Fact.*** In the event that DJG or CMI is unable for any reason whatsoever after undertaking reasonable efforts to secure my signature to any lawful and necessary document required to apply for or execute any patent, copyright or other applications with respect to DJG Inventions (including improvements, renewals, extensions, continuations, divisions or continuations in part thereof), I hereby irrevocably appoint DJG and CMI and their duly authorized officers and agents and attorneys-in-fact to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other rights thereon with the same legal force and effect as if executed by me.

6. ***Survival.*** Notwithstanding the termination of my employment, §3.2 and Article 2 shall survive such termination. This Agreement does not in any way restrict my right or the right of DJG to terminate my employment at any time, for any reason or for no reason.

7. ***Specific Performance.*** A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to DJG and CMI for which there will be no adequate remedy at law, and DJG and CMI shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

8. ***Waiver.*** The waiver by DJG or CMI of a breach of any provision of this Agreement by me will not operate or be construed as a waiver of any other or subsequent breach by me.

9. ***Severability.*** If any part of this Agreement is found invalid or unenforceable, that part will be amended to achieve as nearly as possible the same economic effect as the original provision and the remainder of this Agreement will remain in full force.

10. ***Governing Law.*** This Agreement will be governed by and construed in accordance with the laws of the United States and the State of Indiana as applied to agreements entered into and to be performed entirely within Indiana between Indiana residents.

11. ***Choice of Forum.*** The parties hereby submit to the jurisdiction of, and waive any venue objections against, the U.S. District Court for the Southern District of Indiana, and the Superior and Circuit Courts of the State of Indiana, Bartholomew County, in any litigation arising out of the Agreement.

12. ***Entire Agreement.*** This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether written or oral. This Agreement may be amended or modified only with the written consent of DJG, CMI and me. No oral waiver, amendment or modification will be effective under any circumstances whatsoever.

13. ***Assignment.*** This Agreement may be assigned by DJG or CMI. I may not assign or delegate my duties under this Agreement without prior written approval of DJG and CMI. This Agreement shall be binding upon my heirs, successors, and permitted assignees.

**EMPLOYEE:**

Date: 11/15/01 — Lois DiMartinis
Signature

Lois DiMartinis
Printed Name

Director of Marketing
Title

I am signing this document out of necessity to keep my current position. My attorney has reviewed this document and has advised me that section 2 is too agressive. Dorel has advised me that no changes will be made to the document. Therefore, I am left with no choice but to sign this document or fear losing my job. I have signed this after receiving significant pressure from Sr. Mgmt.

Date: ____________

**Dorel Juvenile Group, Inc.**

By: [signature] 12.12.01

Title: EVP Human Resources

Date: ____________

**Cosco Management, Inc.**

By: [signature]

Title: VP